IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Jaime M. Hysell,               :

      Plaintiff,             :

    v.                       :      Case No.  2:14-cv-2348

                     :      JUDGE JAMES L. GRAHAM
Commissioner of Social Security,      Magistrate Judge Kemp

      Defendant.             :


REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Jaime M. Hysell, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on December 10, 2012, and alleged that Plaintiff became disabled on January 1, 2010.

After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on March 11, 2014.  In a decision dated May 23, 2014, the ALJ denied benefits.  That became the Commissioner's final decision on September 18, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on February 6, 2015.  Plaintiff filed her statement of specific errors on March 11, 2015, to which the Commissioner responded on June 12, 2015.  No reply brief has been filed, and the case is now ready to decide.

II.  The Lay Testimony at the Administrative Hearing

Plaintiff, who was 36 years old at the time of the administrative hearing and who has a college education, testified as follows.  Her testimony appears at pages 59-79 of the

administrative record.

Plaintiff first testified that her last job was with Home Instead Elderly Care. The job included bathing a client, taking the client to meals, and providing respite care. Before that, she was a pre-school teacher. She said she could no longer work because, due to depression, her memory was impaired. She took medication for depression, anxiety, headaches, high blood pressure, and GIRD.

Concerning her depression, Plaintiff said that she had memory lapses on occasions which caused her to forget where she was. It might take twenty minutes for her to recall. Her husband made sure she remembered to take her medications. She also had side effects from her medications, including dizziness and sleepiness, and she napped quite often. Her headaches occurred every day. Some were low pressure headaches, which were made better by lying down. She had a shunt implanted which had given her some, but not much, relief for her other headaches, but if they were severe, only a lumbar puncture relieved them. She underwent that procedure once a month.

In response to some additional questions from the ALJ, Plaintiff testified that she still had soreness in her knee that made kneeling or bending difficult, and that she could not stand for two hours in a workday. Sitting for as little as 15 minutes was problematic. In a typical day, Plaintiff prepared breakfast for her children and got them ready for school. After that, she either went back to bed or sat on a couch and watched television. On a good day, which occurred four or five times a month, she did housework and prepared dinner. On a bad day, she simply slept. She tried to avoid leaving the house but did attend church.

### III. The Medical Records

The medical records in this case are found beginning on page 427 of the administrative record. The Court will summarize those

records, as well as the opinions of the state agency reviewers, to the extent that they are pertinent to Plaintiff's four statements of error.

The first record relating to the issues involved in this case, apart from some office notes from her family doctor indicating that Plaintiff had been treated for moderate depression in 2008 and 2009, is an emergency department report dated May 23, 2009. It showed that Plaintiff had been in a motor vehicle accident the previous day and that she developed a headache shortly afterward. Her past medical history included pseudotumor cerebri (which is characterized by an increase in intercranial pressure without obvious explanation, symptoms which mimic those of an actual brain tumor) and depression. She was given medication and discharged to the care of her primary physician. (Tr. 483-84). In 2009 and 2010, she sought treatment specifically for her depression from Dr. Brandemihl, who, among other things, added some medications for her. She also had been seeing a specialist for her pseudotumor cerebri; that physician, Dr. Eubank, reported in July, 2010 that she had been doing well on Topamax but then experienced a return of her headaches, which prompted Dr. Eubank to suggest a lumbar puncture if things did not improve. (Tr. 502-03). She did have such a procedure done in 2010, apparently without much improvement in her symptoms.

On September 20, 2010, Dr. Schulz performed a consultative psychological evaluation. Plaintiff told him she could not work due to pseudotumor, depression, anxiety, and hypertension. She was attending weekly counseling sessions at that time. Her affect and mood were appropriate and she did not show any physical signs of depression or anxiety. The diagnoses included an anxiety disorder and a depressive disorder, and her GAF was rated at 58. Dr. Schulz thought that Plaintiff was mildly impaired in her ability to relate to others and to follow

instructions, as well as in her ability to maintain attention, concentration, persistence, and pace, and that she was moderately impaired in her ability to handle work stress.  (Tr. 581-88). Another such evaluation was done in 2012, this time by Dr. Johnson, also a psychologist.  New symptoms at that time included visual hallucinations and contemplating suicide.  Her affect was tearful at times.  Dr. Johnson diagnosed anxiety (but not depression), rated Plaintiff's GAF at 57, and viewed her as having some limitations in the area of dealing with work stress, but only minor limitations in other areas of work-related functioning.  (Tr. 936-42).

Plaintiff discontinued seeing Dr. Eubank for almost two years, but returned for a visit on August 22, 2012.  She said she had gotten a neurological consult to discuss the placement of a shunt, but her headaches improved and she did not follow through with that procedure.  However, the headaches again worsened and she had undergone two lumbar punctures with some temporary relief.  (Tr. 739).  He referred her for possible placement of stents in the intercranial sinus system, but that procedure was not recommended by Dr. Pema, to whom she had been referred.  She had a headache in November, 2012, which caused her to pass out and fall; she was treated at Riverside Hospital afterwards, after having a lumbar puncture done at the emergency room.  Eventually, in 2013, Plaintiff had an LP shunt implanted.  She continued to be treated for headaches after that time, including at the emergency room.  Dr. Eubank saw her on September 25, 2013, and wrote Dr. Richardson a letter saying that after some adjustments to the shunt, Plaintiff's low-pressure headaches were better, but she was still having daily headaches which caused nausea and occasional vomiting.  Dr. Eubank did not think there were many treatment options left, but he did increase her dosage of Topamax.  (Tr. 1272-73).

-4-

Dr. Richardson, Plaintiff's primary care physician, completed a residual functional capacity questionnaire on February 22, 2013.  He said that she experienced symptoms of confusion, cognitive impairment, weakness, and loss of some reflexes; that her medications could cause drowsiness and dizziness; that she could sit for eight hours a day but could not stand or walk at all; that she could occasionally lift up to ten pounds; that she would miss work more than four days per month; and that she could not sustain work activity.  (Tr. 945-46).  He completed another assessment on December 13, 2013, indicating that Plaintiff could not sit, stand, or walk at all during a workday, and he also completed a mental assessment form on which he said that she had marked impairments in every work-related area of functioning.  (Tr. 1432-37).

Plaintiff underwent a psychiatric hospitalization in November, 2013.  At that time, she was facing arson charges after burning down a shed on her property to get insurance money.  Her GAF was rated at 25, and she was treated for unstable mood and suicidal thoughts.  She was discharged with a recommendation to follow up with mental health counseling, which she did.  At her initial counseling assessment, Plaintiff reported a five-year history of daily feelings of helplessness and hopelessness as well as frequent crying spells.  She also said that she began to have problems with concentration eleven years before, with symptoms worsening recently.  Plaintiff denied any homicidal ideation and any recent (since her hospitalization) suicidal ideation.  Individual counseling, group counseling, and psychiatric services were recommended.  Her GAF was rated at 45.  (Tr. 1421-29).

Finally, state agency reviewers expressed opinions as to Plaintiff's functional capacity.  In 2013, Dr. Bolz found no exertional restrictions at all, but one postural limitation (no

-5-

climbing of ropes, ladders, or scaffolds) and some environmental limitations. (Tr. 128-29). Dr. Cacchillo disagreed to some extent, limiting Plaintiff to medium work. (Tr. 164-66). Neither mentioned obesity as a limiting factor. On the psychological side, both reviewers, Drs. Tangeman and Rivera, found some moderate limitations but thought that Plaintiff could work in an environment where duties were routine and predictable. (Tr. 146-47, 166-68). Both also found that she could relate to others on a superficial and occasional basis.

IV. <u>The Vocational Testimony</u>

Eric Pruitt, a vocational expert, testified at the administrative hearing. His testimony begins at page 79 of the administrative record.

Mr. Pruitt began by testifying about Plaintiff's past relevant work. He was told to assume that the caregiver job was not done at the substantial gainful activity level, so the primary job in question was the teaching job. That job was skilled and light. It appeared that Plaintiff had also worked as a customer service representative, a sedentary, semi-skilled job, and as a data entry operator, which was the same.

Mr. Pruitt was then asked to answer some questions about a hypothetical person who could do light work and who could occasionally climb ramps or stairs, stoop, crawl and who could never climb ladders, ropes, or scaffolds or be exposed to hazards such as machinery and heights. The person also was limited to simple, routine, repetitive tasks in a low-stress environment involving only frequent (as opposed to constant) contact with others. According to Mr. Pruitt, such a person could not do Plaintiff's past work, but he or she could work as a housekeeper/cleaner, laundry press operator, or office helper. He gave numbers for such jobs as they existed in the regional and national economies and also said that his testimony was

-6-

consistent with the DOT.

Next, Mr. Pruitt was asked to assume that the person had frequent headaches and depression and would be off task for 20% of the time for that reason.  He testified that such limitations would eliminate all competitive jobs, as would missing work four or more times per month.

V.  The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 37-47 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirement of the Social Security Act through June 30, 2012.  Next, she found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 1, 2010.

Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including left knee arthroscopy with chondroplasty of the patella, status post placement of programmable lumbar peritoneal lumbar puncture shunt, status post tear of the long head of the biceps tendon, headaches secondary to pseudotumor cerebri, obesity, sacroiliitis, a bipolar disorder, and anxiety.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1), including sections 12.04 and 12.06.

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level except that she could never climb ladders, ropes, or scaffolds or be exposed to hazards, hazardous machinery, or heights.  Further, she was limited to unskilled work that is simple, routine, and repetitive

-7-

in nature which could be performed in an environment which required frequent but not constant contact with coworkers and the public.

The ALJ found that, with these restrictions, Plaintiff could not perform her past relevant work, but she could do the jobs identified by the vocational expert including housekeeper/ cleaner, laundry press operator, and office helper. The ALJ also concluded that these jobs existed in significant numbers in the region and nationally. Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

VI. Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises four issues. She asserts that (1) the ALJ erred by not finding that her bipolar disorder met section 12.04 of the Listing of Impairments; (2) the ALJ's residual functional capacity finding was not supported by substantial evidence; (3) the ALJ's credibility finding was not supported by substantial evidence; and (4) the ALJ's step five determination was not supported by substantial evidence. These issues are considered under the following legal standard.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th

-8-

Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

A. <u>Listing Section 12.04</u>

Plaintiff's first statement of error asserts that the ALJ erred in her analysis of Plaintiff's psychological impairment under section 12.04 of the Listing of Impairments. Specifically, she argues that her bipolar disorder should have been found to equal that section, and particularly the requirements of the "B" criteria, based primarily on the evaluation done by Dr. Richardson, plus some of the symptoms observed by Dr. Vishnupad during her November, 2013 hospitalization. The Commissioner responds that substantial evidence supports the ALJ's decision on this issue.

Like many of the sections of the Listing relating to psychological impairments, the "B" criteria accompanying section 12.04 provide that, in order to satisfy that particular subsection, the claimant's impairment must produce marked restrictions in at least two of four areas: (1) activities of daily living; (2) social functioning; (2) maintaining concentration, persistence, and pace; and (4) repeated episodes of decompensation in work or work-like settings. Plaintiff's argument is that she had "at least marked restrictions in maintaining concentration, persistence, or pace and in

-9-

maintaining social functioning." Statement of Errors, Doc. 14, at 10. The ALJ found no marked restrictions in any of the "B" criteria categories.

In the section of the administrative decision where the ALJ analyzed this issue, the ALJ found that Plaintiff had no more than moderate restrictions in activities of daily living, social functioning, and maintaining concentration, persistence, or pace. In support of the latter two findings, the ALJ noted that both Drs. Johnson and Schulz found only mild or minor restrictions in this area, and that Plaintiff was able to relate to family members, spend time with others, attend church, and perform other tasks outside the home. Plaintiff does not specifically address any of this evidence. As to concentration, persistence, and pace, the ALJ pointed out that, again, neither of the consultative examiners found marked restrictions here. Again, Plaintiff does not discuss this evidence in her statement of errors. It is also worth noting that neither of the state agency reviewers found marked limitations in this area.

Plaintiff does point out, in a footnote, that the ALJ did not acknowledge, in the section of the administrative decision relating to the Listing of Impairments, that Dr. Richardson had expressed an opinion as to the severity of Plaintiff's mental functional capacity. She does not argue, however, that as to the Listing issue, the ALJ erred in that regard by violating the "treating physician" rule. Because she does make that argument in her next statement of error, the Court will address it below. Absent a determination that the ALJ was bound to accept Dr. Richardson's conclusions on the "B" criteria issue, however, the Court finds no error in the ALJ's analysis and resolution of that issue.

B. <u>The RFC Determination</u>

Under this general statement of error, Plaintiff raises four separate sub-issues. They address, in turn, the ALJ's treatment

-10-

of Dr. Richardson's opinion, an alleged inconsistency between the ALJ's step two finding concerning certain physical impairments and Plaintiff's physical residual functional capacity, the way the ALJ factored Plaintiff's obesity into her decision, and the ALJ's discussion of Plaintiff's headaches. The Court will discuss each of these issues separately.

1. <u>Dr. Richardson's Opinion</u>

First, Plaintiff faults the ALJ for preferring the opinions of the state agency reviewers over that of Dr. Richardson concerning Plaintiff's mental residual functional capacity. She notes that he treated her for depression for seven years, prescribed medication for that condition, and referred her to individual counseling. She also asserts that his conclusions were consistent with those of Dr. Johnson and Dr. Vishnupad. Ultimately, she argues that the ALJ's discussion of Dr. Richardson's opinion was not "meaningful."

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. §404.1527(c); <u>see also Lashley v. Secretary of H.H.S.</u>, 708 F.2d 1048, 1054 (6th Cir. 1983); <u>Estes v. Harris</u>, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. <u>Moon v. Sullivan</u>, 923 F.2d 1175 (6th Cir. 1990); <u>Loy v. Secretary of HHS</u>, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. <u>Cutlip v. Secretary of HHS</u>, 25 F.3d 284 (6th Cir. 1994). No matter how the issue of the weight to be given to a treating physician's opinion is finally

resolved, the ALJ is required to provide a reasoned explanation
so that both the claimant and a reviewing Court can determine why
the opinion was rejected (if it was) and whether the ALJ
considered only appropriate factors in making that decision.
Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir.
2004).

The ALJ had only this to say about Dr. Richardson's
evaluation of Plaintiff's mental residual functional capacity:

> No weight was granted to the mental and physical
> restrictions that Dr. Richardson reported in his
> medical source statements.... These restrictions are
> conclusory, speculative and not grounded on the mostly
> unremarkable clinical signs reported in physical and
> neurological examinations and in the clinical signs and
> opinions provided by the consultative examiners.

(Tr. 45). The ALJ made no effort to specify which physical and
neurological examinations she had in mind (neither of which would
appear to have any relationship to Plaintiff's psychological
impairments) and did not make more specific reference to the
signs and opinions reported by the consultative examiners. Other
portions of the administrative decision indicate that the ALJ
adopted the findings of the state agency reviewing psychologists
by granting them great weight.

The Commissioner asserts that Dr. Richardson's opinion as to
mental capacity was "weak evidence" because it was expressed on a
"check the box" form and that it could not be given controlling
weight because it was not "well-supported by acceptable medical
evidence." The Commissioner also argues that Dr. Richardson's
opinions were inconsistent with the record as a whole, and with
Plaintiff's testimony that she was able to relate with others and
perform some activities like shopping and going to church. The
problem with this argument is that it supplies a rationale which
cannot be found in the ALJ's decision. A discussion of the
opinions of a treating source as brief and non-specific as that

provided by the ALJ in this case simply does not comply with
either the mandate of §404.1527(c) or with the way that the Court
of Appeals has interpreted that regulation.

Evaluating a treating source opinion involves a series of
steps.  The first is to decide whether to give that opinion
controlling weight.  It is not entitled to such weight if "not
well-supported by medically acceptable clinical and laboratory
diagnostic techniques or if it is inconsistent with the other
substantial evidence in the case record."  Social Security Ruling
(SSR) 96-2p.  However, if the ALJ declines to give a treating
source opinion controlling weight on this basis, he or she must
explain why in terms other than simply repeating the words of the
regulation.  As the Court of Appeals said in Gayheart v. Comm'r
of Social Security, 710 F.3d 365, 377 (6th Cir. 2013), "[t]he
failure to provide 'good reasons' for not giving [a treating
source's] opinions controlling weight hinders a meaningful review
of whether the ALJ properly applied the treating-physician rule
that is at the heart of this regulation."  In Gayheart, the court
found that a conclusory statement that the treating source
opinion was not well-supported by objective findings was too
ambiguous to satisfy the ALJ's duty to articulate the reasons for
his or her findings, and also held that the failure to identify
the evidence which was inconsistent with the treating source
opinion - apart from a reference to non-treating or non-examining
doctors - was insufficient as well.  As the Gayheart court also
observed, "[s]urely the conflicting substantial evidence must
consist of more than the medical opinions of the nontreating and
nonexamining doctors. Otherwise the treating-physician rule would
have no practical force because the treating source's opinion
would have controlling weight only when the other sources agreed
with that opinion."  Id.  Finally, that court held that it is
error to proceed to the second step of the process - determining
what weight to give the treating source opinion using the various

factors listed in §404.1527(c) - until the ALJ has properly
explained why the opinion was not entitled to controlling weight.

     Here, the ALJ's explanation of her decision to give no
weight to a treating source opinion is limited to the recitation
of a few conclusory statements which the ALJ applied generically,
and without differentiation, to both the physical or mental
limitations expressed in Dr. Richardson's opinions.  The ALJ
identifies no inconsistent evidence apart from a general
reference to the consultative examiners, whose opinions, under
Gayheart, cannot constitute the sole basis for rejecting a
treating source opinion, and she also fails to mention any of the
factors set forth in §404.1527(c).  Even if the decision not to
accord controlling weight to Dr. Richardson's opinion was
adequately explained - which it was not - the decision to give it
no weight whatsoever was also the product of a deficiently-
articulated reasoning process.  The Court also notes that
although the ALJ purported to give great weight to all of the
opinions of the state agency reviewers, she did not adopt their
opinions in their entirety and did not explain why some of their
limitations, such as those relating to contact with coworkers and
the general public, were not incorporated into the RFC finding.
Overall, taking the ALJ's expressed rationale, as opposed to the
one provided in the Commissioner's memorandum, as the basis for
its decision, the Court cannot conclude that the ALJ adequately
articulated her reasoning.  The Commissioner has not advanced an
alternative argument based on harmless error, and, as Wilson
recognized, such an argument is difficult to make when there has
been a violation of the reason-giving requirement of
§404.1527(c).  Therefore, the Court finds this first subpart of
Plaintiff's second statement of error to be meritorious.

                    2.  Severe Physical Impairments

     In the next subsection of this argument, Plaintiff observes
that, at step two of the sequential evaluation process, the ALJ

                              -14-

found that Plaintiff's severe impairments included left knee
arthroscopy with chondroplasty of the patella and status post
tear of the long head of the biceps tendon. However, the ALJ did
not find that Plaintiff was limited in her ability to stoop,
kneel, crouch, crawl, balance, or reach. This is an
inconsistency which, according to Plaintiff, is intensified by
Dr. Richardson's finding that she could not lift over ten pounds,
and independently justifies a remand. The Commissioner contends
that because the only treatment recommended for these conditions
was weight loss and exercise, limiting Plaintiff to light work
adequately accounted for these conditions.

Again, part of the issue here is the ALJ's inadequately-
articulated explanation for rejecting Dr. Richardson's opinions
in their entirety, including his lifting restriction. Further,
the treatment prescribed for these conditions does not equate to
an evaluation of the extent to which they limited Plaintiff's
functioning. Can Plaintiff actually stoop or kneel on a
repetitive basis notwithstanding the fact that she has a
documented (and by the ALJ's own finding, a severe) knee
condition which has been treated by several physicians? The
record does not indicate that she can, and the ALJ did not give a
substantial reason for finding no such limitations. This issue
should be addressed on remand as well.

### 3. Obesity

Next, Plaintiff asserts that the ALJ did not properly
evaluate her obesity under SSR 02-1p. She notes that the ALJ
found, at step two, obesity to be a severe impairment, and argues
that the ALJ simply ignored the effects of that impairment at the
later stages of the process. The Commissioner's response is
essentially limited to the argument that "[t]here was no evidence
in the record that Plaintiff's obesity caused an inability to
walk effectively." Memorandum in Opposition, Doc. 19, at 11.

An ALJ may properly account for a claimant's obesity by

-15-

relying on the functional capacity assessment of a physician who has taken obesity into account. <u>See Coldiron v. Comm'r of Social Security</u>, 391 Fed.Appx. 435, 443 (6th Cir. Aug. 12, 2010). However, as this Court said in <u>Smith v. Comm'r of Social Security</u>, 2014 WL 4351517 (S.D. Ohio Sept. 2, 2014), <u>adopted and affirmed</u> 2014 WL 5502358 (S.D. Ohio Oct. 30, 2014), if it is not clear that any of the evaluating sources actually took a claimant's obesity into account, and the ALJ also fails to discuss it, a reversible error may have occurred.

Here again, the administrative decision is completely silent on how the ALJ considered obesity when determining Plaintiff's residual functional capacity.  Nor did any of the state agency physicians mention it.  The decision on remand therefore should include a more complete discussion of how, if at all, Plaintiff's obesity impacted her ability to perform work-related activities.

### 4.  Headaches

Plaintiff's final argument under this section relates to her pseudotumor cerebri and the headaches resulting from that condition.  Most of her argument on this point focuses on the ALJ's decision to credit the opinions of the state agency reviewers over those of Dr. Richardson, a subject discussed more thoroughly above.  She does suggest that the ALJ ignored substantial evidence of the recurrence of her headaches despite placement of the shunt, and that the ALJ mistakenly dismissed her complaints about headaches because there was no neurological confirmation of her symptoms.

The Commissioner's memorandum does not appear to respond to this argument.  Because the Court is recommending a remand for other reasons, this issue can also be addressed as part of the remand proceedings.  It is, of course, important that an ALJ not rely on the absence of objective findings when evaluating a condition which is well-documented but does not produce such findings, so the ALJ should take that into account here.  <u>Cf.</u>

-16-

Rogers v. Comm'r of Social Security, 486 F.3d 234, 245 (6th Cir. 2007)("in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant").

C.  The Credibility Determination

Plaintiff also challenges the ALJ's credibility determination.  This argument has multiple parts as well. Plaintiff contends that the ALJ did not properly evaluate her testimony, finding (incorrectly) that her statements concerning her abilities were consistent with the ability to perform light work activity; that the ALJ improperly focused on the lack of objective medical evidence instead of considering the entire record, as required by SSR 96-7p; and that the ALJ did not acknowledge the side effects of her medications.  The Commissioner counters that the ALJ had a substantial basis for her decision that Plaintiff's testimony was not fully credible.

A social security ALJ is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking.  Rather, the ALJ must consider other evidence, including the claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors.  20 C.F.R. §404.1529(c)(3).  Although the ALJ is given wide latitude to make determinations about a claimant's credibility, the ALJ is still required to provide an explanation of the reasons why a claimant is not considered to be entirely credible, and the Court may overturn the ALJ's credibility determination if the reasons given do not have substantial support in the record.  See, e.g. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

The ALJ cited to the proper regulations and rulings and also recited this standard properly.  (Tr. 42).  Subsequently, the ALJ

-17-

did reject Plaintiff's claim of daily headaches because "the clinical signs observed during multiple physical examinations have been unremarkable ...." (Tr. 43). The ALJ added that Plaintiff's description of her headaches is "at times" consistent with a moderate condition and that she often used Excedrin as treatment, something used for mild to moderate pain. Id. The ALJ did not discuss the fact that daily use of Excedrin is not indicated and that no medication appeared to be helping Plaintiff's condition. The ALJ did not mention side effects of medication, although they are documented in the record, and the ALJ suggested that Plaintiff's ability to care for her family, cook, and drive, were indicative of the ability to perform a "wide range" of activities, even though that is not how the Plaintiff described them. (Tr. 44).

Giving all required deference to the ALJ's position as the judge of credibility, the Court finds this explanation of the credibility determination insufficient as well. In particular, the ALJ's reliance on the lack of objective neurological findings, the failure to discuss side effects, and the comments about the use of Excedrin, all detract from the supportability of the ALJ's decision. A new credibility evaluation should also be done on remand.

### D.  The Step 5 Finding

Plaintiff's last argument is that the Step 5 finding was insufficient because the hypothetical question posed to the vocational expert did not properly incorporate all of her limitations. This claim is moot in light of the discussion of her other statements of error. On remand, after the factors set forth in this Report and Recommendation are considered, a new hypothetical question can be formulated which will not have the deficiencies which Plaintiff identifies in her brief.

### VII.  Recommended Decision

Based on the above discussion, it is recommended that the

-18-

Plaintiff's statement of errors be sustained to the extent that this case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

### VIII.   Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge

-19-